IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HELEN BENALLY,

      Plaintiff,

vs.

UNITED STATES OF AMERICA,

      Defendant.

No. 13-CV-0604-MV-SMV

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment [Doc. 61] and Motion to Strike Exhibits Attached to Plaintiff's Response to Defendant's Motion for Summary Judgment [Doc. 71]. The Court, having considered the Motions, briefs, attached materials, relevant law, and being otherwise fully-informed, finds that Defendants' Motion for Summary Judgment is well-taken in part and therefore will be **GRANTED IN PART** and that Defendant's Motion to Strike is well-taken and therefore will be **GRANTED.** As the evidentiary question is antecedent to the summary judgment issue, the Court will first resolve the Motion to Strike and then proceed to the Motion for Summary Judgment.

**I.     Defendant's Motion to Strike**

Defendant United States argues that two items attached by Plaintiff to her Response to Defendant's Motion for Summary Judgment should be stricken from consideration. First, Defendant claims that Plaintiff's affidavit in support of her Response "is inadmissible because it is a sham document" that "is unreliable and inadmissible evidence as it conflicts with Plaintiff's prior deposition testimony." Doc. 71 at 1. Second, Defendant urges that Plaintiff's medical

1

expert's report "is clearly not admissible at the present stage because it is not a sworn statement, affidavit, or other evidence allowed under Fed. R. Civ. P. 56(c)(4) and should not be considered by this Court." *Id.* at 2.  The Court will address each challenged item in turn.

      a. *Plaintiff's Affidavit*

It is clear in this circuit that, on summary judgment, an affidavit that conflicts with the affiant's prior testimony will be disregarded when it "constitutes an attempt to create a sham fact issue" solely to frustrate summary judgment.  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  "Factors to be considered in determining whether an affidavit presents a sham issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."  *Burns v. Bd. of Cnty. Comm'r of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003) (internal quotation marks omitted).

Here, the Court is persuaded that none of these three factors is met and that, therefore, Plaintiff's affidavit may be treated as a sham insofar as it purports to revise her prior testimony.  First, Benally was functionally cross-examined at her deposition.  Although Benally was not subject to formal cross-examination, her attorney was given the opportunity to "clear-up any mis-statements in Plaintiff's testimony, but he did not do so" and, "[i]n fact, Plaintiff made only three minor corrections to her deposition" transcript.  Doc. 70 at 11.  This is sufficient for the requirements of the first element; counsel had an opportunity to clarify his client's testimony and Defendant's questioning, as well as to prepare his client for the inquiries.  Moreover, Federal Rule of Civil Procedure 30(c)(1) expressly provides for cross-examination in the same manner as at trial; the Court presumes, therefore, that the testimony elicited did not inaccurately portray

Plaintiff's understanding, as counsel was present to rehabilitate or revisit any response phrased infelicitously or which misapprehended the question at issue.  *See* Fed. R. Civ. P. 30(c)(1).

Second, Plaintiff clearly had access to all pertinent evidence prior to her deposition and has not suggested that her affidavit is based on material that had only recently been made available.  It is of no moment that Benally "reviewed pertinent evidence, including medical documentation, [only] after her deposition."  Doc. 73 at 4.  None of these documents was unavailable to Plaintiff as she prepared to testify; that she and her attorney neglected to review relevant evidence is a strategic decision whose consequences fall outside of the ambit of the framework established by *Franks* and its progeny.  Failure adequately to prepare for legal proceedings is simply not a practice that the Court will sanction by permitting the amendment of sworn testimony.

Finally, despite her counsel's unsubstantiated, overbroad, and clumsy argument that "[b]eing grilled in a legal proceeding such as a deposition is culturally at odds with Navajo culture, which emphasizes consensus and talking things out" and that "she had never been deposed in her life," the Court finds that Benally was not confused during her deposition.  *Id.* at 4.  Importantly, the Tenth Circuit distinguishes for the purposes of this analysis between genuine "confusion" and "indecisiveness or inconsistency."  *Burns*, 330 F.3d at 1282.  That is, while the transcript reveals several instances in which Benally did not recall information, there is no indication that she did not comprehend the questions posed to her or that she misapprehended the nature of the responses that the inquiries sought to elicit.  Such quotidian imperfections of memory do not satisfy this factor.  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) ("there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning [deponent's] testimony requiring clarification or

explanation."). Further, it appears that the United States endeavored to accommodate Benally far more than the average deponent, including by securing a Navajo interpreter and by taking testimony relatively close to Plaintiff's home, rather than in Albuquerque. *See generally* Doc. 74. Indeed, in reading the deposition transcript, the Court finds nothing to support the contention that Plaintiff was "grilled" by the government and that this contributed to her purported "confusion." *See generally* Doc. 70-1; Doc. 67-11. Thus, none of the three factors is present in this case and, consequently, the Court will not include Plaintiff's affidavit in the corpus of materials considered on summary judgment.

      b. *Plaintiff's Medical Expert's Report*

Defendant argues that the Court should disregard Dr. Roback's expert report because it "is clearly not admissible at the present stage because it is not a sworn statement, affidavit, or other evidence allowed under Fed. R. Civ. P. 56." Doc. 71 at 2. The Court agrees. *See, e.g.*, *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1463 (D. Colo. 1997) ("Other courts have followed [*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)] and declined to consider unsworn expert reports and other statements submitted in the summary judgment context."); *David Otero v. Nat'l Distrib. Co., Inc.*, 627 F. Supp. 2d 1232, 1239 (D.N.M. 2009) ("The hearsay rule applies to unsworn opinions by expert witnesses or treating physicians. Such unsworn opinions do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion.") (modifications original, internal quotation marks omitted). Plaintiff cites no apposite authority to the contrary. *See* Doc. 73 at 5-9.

Indeed, Plaintiff appears to recognize the weakness of her position, as she has submitted an affidavit from Dr. Roback with her Response to the Motion to Strike and urges that "[i]t is

unduly formalistic to require that an expert, in addition to preparing and signing a report, and providing all of the materials required in a disclosure, then have to prepare a separate document in affidavit form." Doc. 73 at 7. Accepting such an untimely remedial affidavit is a matter consigned to the discretion of this Court. *See Fierro v. Norton*, 152 F. App'x 725, 727 (10th Cir. 2005) ("Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion.") (internal quotation marks omitted); *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009) ("The district court has discretion whether to accept or reject such untimely filed materials.") (internal quotation marks omitted). Here, the Court perceives no reason to accept these tardy materials, as it appears that the sole reason that they were not filed properly is that counsel misunderstands the evidentiary requirements of summary judgment and the Federal Rules of Civil Procedure. Thus, the Court will strike Dr. Roback's expert report and will ignore the other materials untimely submitted as it evaluates Defendant's Motion for Summary Judgment.

## II. Defendant's Motion for Summary Judgment

### a. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 directs the Court to enter summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the Motion before it, the Court will "consider all facts and evidence in the light most favorable to the part[y] opposing summary judgment." *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1154 (10th Cir. 2014). In judging whether a *genuine* issue of material fact exists, the Court asks "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "if under the substantive law [the fact] is essential to the proper disposition of the claim."

*Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014) (internal quotation marks omitted). Thus, "a mere factual dispute need not preclude summary judgment." *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100 (10th Cir. 2002).

      b.  *Medical Malpractice in New Mexico*

The Federal Tort Claims Act effects a limited waiver of the sovereign immunity of the United States and incorporates the substantive tort law of the location of the incident as the rule of decision. *Miller v. United States*, 463 F.3d 1122, 1123 (10th Cir. 2006) ("we look to state law to resolve questions of substantive liability."). *See also* 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."); 28 U.S.C. § 1346(b)(1) (conferring jurisdiction on the district courts over cases in which "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."). In the case at bar, the parties agree that the allegedly tortious conduct at issue took place in New Mexico and that, consequently, the Court must refer to the state's law regarding medical malpractice in its summary judgment analysis.

To make out a case of medical malpractice in New Mexico, "a plaintiff must show that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries." *Brown v. Kellogg*, 340 P.3d 1274, 1275 (N.M. Ct. App. 2014). Further, a "defendant seeking summary judgment in a medical malpractice action bears the initial burden of negating at least one of the essential elements upon which the plaintiff's claims are grounded." *Diaz v. Feil*, 881 P.2d 745, 748 (N.M. Ct. App. 1994) (internal quotation marks omitted). As with ordinary negligence,

while the existence of a medical duty is a question of law "the [remaining] elements of negligence are generally facts for the jury to determine." *Blake v. Pub. Serv. Co. of N.M.*, 82 P.3d 960, 962 (N.M. Ct. App. 2003). *See also Trujillo v. Treat*, 752 P.2d 250, 252 (N.M. Ct. App. 1988) ("Negligence and proximate cause are, likewise, generally questions of fact for the jury, unless reasonable minds cannot differ.").

      c. *Factual Background*

Plaintiff Helen Benally is a seventy-one-year-old Navajo woman who lives near Shiprock, New Mexico. *See* Doc. 61 at 1; Doc. 67 at 1. On November 22, 2008, Plaintiff reported to the Northern Navajo Medical Center after "sustain[ing] a fall at her home." Doc. 61 at 2. Unfortunately, that facility did not have adequate facilities to address her injury and Plaintiff "was transferred to Gallup Indian Medical Center ('GIMC') under the care of orthopedic surgeon Dr. David Poe." *Id. See also* Doc. 67 at 1. "Dr. Poe diagnosed Plaintiff with a fracture to her left femur and recommended a fixation surgery using a metal pinning device." Defendant's Statement of Undisputed Material Facts ("DSUMF") ¶ 1. Prior to securing Plaintiff's consent to the procedure, Dr. Poe "discussed the surgery and complications associated with left hip pinning including the success rate, fail rate, infection rate (3% for a diabetic), wound healing rate, stiffness, bone healing (especially with Plaintiff's osteoporosis), and blood clots, nerve and vascular injury." *Id.* ¶ 2. Plaintiff notes that "there is no indication in the cited materials that success and failure rates were discussed," but even if Dr. Poe did not reduce the probability of success to a percentage, he plainly explained the procedure he intended to execute, potential complications, and whether any feasible alternatives were available. Doc. 67 at 3; DSUMF ¶ 1. Plaintiff signed the consent form to indicate that Dr. Poe had explained the procedure to her. Doc. 61-3 at 1.

The following day, November 23, 2008, "Dr. Poe performed surgery to repair Plaintiff's left femur fracture," known "in technical terms" as "an open reduction-internal fixation of the left femur using a metal palate and screws to hold the bone fracture in place and properly align the femur."  DSUMF ¶ 2.  A few weeks later, on December 26, 2008, Plaintiff returned for a post-surgical visit.  *Id.* ¶ 3.  Dr. Poe noticed that "the appliances were in place with a slight upward movement of the pin with slight impaction that he believed was caused by Plaintiff putting her full weight on the left leg" and he "drew a picture of the hip/femur anatomy" to explain his instruction "to apply limited weight on her left hip" to avoid further complications.  *Id.*  Contrary to Benally's contention, her deposition testimony merely establishes that she did not remember whether Dr. Poe instructed her not to rest weight on the hip, not that no such prohibition was issued.  *See* Doc. 67-12 at 2-3.  Dr. Poe asked that Benally return again three months later.  DSUMF ¶ 3.

During the March 2009 visit, "Plaintiff complained of significant pain, rating it 8 out of 10, especially when she walked" which induced Dr. Poe again to "instruct[] Plaintiff not to put weight on her left leg" and to urge that she "take her calcium and vitamins."  *Id.* ¶ 4.  The physician explained that "the pin had slipped superiorly out of the" femur and "drew a picture on the medical chart and explained to Plaintiff how her hip was not healing."  *Id.*  Dr. Poe again scheduled a follow-up meeting, requesting that Plaintiff return in eight weeks, although it appears that there may have been an administrative delay in mailing the appointment card.  *Id. See also* Doc. 67 at 6.  The Court notes Plaintiff's vigorous objection that some of the facts adduced by the Defendant are contained in Dr. Poe's deposition testimony, rather than in his notes from his appointments with Benally, but finds that testimony is competent evidence and that such minor inconsistencies do not produce a genuine issue of material fact.

"Seventeen weeks later, on August 6, 2009, Plaintiff saw Dr. Poe and stated that her pain was 10 out of 10 and that she had limited mobility in her hip." DSUMF ¶ 5. At this point, the surgical pin had uncoupled from the bone and "there was a non-union of the fracture," which had caused a "shortening of the left lower extremity and limited mobility of the left hip." *Id.* Consequently, Dr. Poe drew yet another diagram "of the post-surgical condition of the hip on the chart to explain this concerning situation to Plaintiff" and informed Benally that she needed a complete hip replacement. *Id.* Again, the Court notes that Plaintiff vehemently objects to this assertion in its Response, but marshals no evidence, other than the inadmissible affidavit, to the contrary. *See* Doc. 67 at 7. Indeed, the medical records for the August 6, 2009 note the need for a total hip replacement salvage operation. *See* Doc. 67-4 at 1.

After another apparent scheduling issue, "Plaintiff returned to see Dr. Poe" on March 18, 2010. DSUMF ¶ 7. By this time, her leg had shortened by one-and-a-half centimeters and had a "limited range of movement" such that Dr. Poe again discussed pain medication, vitamins and calcium, and the need for a "re-pinning or a total hip replacement." *Id.* Plaintiff refused any further surgical intervention. *Id.* Plaintiff complains that "Dr. Poe did not offer plaintiff a clear option of having surgery at UNMH," Doc. 67 at 9, but the doctor explained in his deposition testimony that "I don't know that there was any specific recommendation for transferring out, because [Benally] did not have interest in" additional surgery. Doc. 61-2. That is, Dr. Poe did not discuss the logistics of the remedial surgery because Benally facially refused any additional surgical intervention. Dr. Poe repeated his ritual of drawing an explanatory sketch of the femur and scheduling a return visit for Benally. DSUMF ¶ 7.

Physician and patient replayed roughly the same interaction on June 17, 2010 when Plaintiff returned. She had fallen out of her bed, "which exacerbated her pain," had been "using

9

a wheelchair for mobility," and continued to exhibit a non-union in the femur. *Id.* ¶ 8. On this occasion, however, Plaintiff acquiesced to remedial hip surgery and "Dr. Poe referred her to University of New Mexico Hospital for a total left hip replacement." *Id.* Evidently, this surgery was successful, but is outside the scope of this case. For the reasons explained below, the Court does not believe that complete summary judgment is appropriate in the instant case and, therefore, will discuss each of the individual propositions on which the United States has requested summary judgment.

        d. *The Choice of Femur Surgery was Within the Standard of Care*

There is no genuine dispute that the surgery Dr. Poe performed was within the applicable standard of care. Even Plaintiff's own expert testified in his deposition that Dr. Poe's "deciding to do this surgery, sliding nail, Zimmer, fine. It's perfect. I mean, I have no criticism of that choice." Doc. 67-16 at 2. *See also* DSUMF ¶ 10. Consequently, Defendant is entitled to judgment as a matter of law that the selection of femur surgery that Dr. Poe performed on Benally did not breach the standard of care.

        e. *Dr. Poe Did Not Properly Obtain Informed Consent to Perform Surgery*

As discussed above, the Court finds that Dr. Poe adequately described the contours of the pinning surgery and its associated risks. However, the record leaves open the possibility that it was beneath the governing standard of care for Dr. Poe "not to at least mention [the possibility of hip replacement surgery] and tell [Benally] why he didn't want to do it" because "if she doesn't have the choice [between surgical interventions], if she doesn't -- you can't make an informed decision if you don't have information." Doc. 67-16 at 2-3. That is, while testimony adduced by the parties indicates that a total hip replacement was likely unnecessary when Dr. Poe first

10

examined Benally, there remains a genuine dispute as to whether failure to present surgical alternatives rendered the consent uninformed. Hence, Defendant's argument that the "fact that [Dr. Poe] did not tell [Benally] that she may need a hip replacement is not germane to the issue because she elected to have the hip pinning procedure to repair her broken leg" reaches too far. Doc. 61 at 13.

While Benally may have consented to the procedure that Dr. Poe performed, it appears that she did so without a discussion of the relevant array of surgical alternatives, such as a total hip replacement. Consent rendered without all material information is a nullity in New Mexico. *See, e.g.*, *Gerety v. Demers*, 589 P.2d 180, 192 (N.M. 1978) ("where a physician does not disclose all the information deemed material to his patient's decision, it nullifies the consent obtained prior to treatment… The physician is required to disclose the factors that might reasonably influence the patient in his decision, such as … any alternatives to that treatment."). At this juncture, there is insufficient information definitively to establish the parameters of the standard of care with respect to the information necessary to render appropriate consent and the Court believes that a jury might reasonably hold that it was negligent for Dr. Poe not to engage in a more capacious discussion of his patient's options prior to engaging in surgery.

      f. *Dr. Poe Employed Appropriate Surgical Techniques*

Plaintiff effectively concedes this proposition, accepting that "the surgical technique used in performing the surgery was not outside the standard of care," although she adds that "Dr. Poe failed to realize that plaintiff had an unstable fracture and that the procedure was inadequate and would lead to failure and further surgery." Doc. 67 at 12. Even so, Plaintiff's expert acknowledged that while "you have to make sure you know what you've got" the procedure was not "wrong" only that "it may not be enough," despite being "a very accepted procedure."

11

Doc.67-15 at 2.  In aggregate, the consensus with respect to this theory of negligence is largely identical to that described above; the pinning procedure, even if not ideal, was within the standard of care.  The Court is reminded that a "poor medical outcome is not necessarily evidence of any wrongdoing" and "healthcare provider is not required to guarantee a particular beneficial result."  *Alberts v. Schultz*, 975 P.2d 1279, 1284 (N.M. 1999).  Hence, although the procedure yielded a suboptimal result, this is no indication that it was executed improperly nor that its selection was inappropriate, merely that the operation ultimately did not succeed.

       g. *Dr. Poe Did Not Adequately  Inform Plaintiff of the Possible Failure of Surgery*

This contention also remains in dispute.  Although Dr. Poe warned Benally about several of the risks associated with the pinning surgery, Dr. Roback testified in his deposition that the discussion and language in the consent form may have been insufficient, stating that "[t]he most important [warning] is probably the -- you may need another surgery."  Doc. 67-17 at 3.  He noted that general statements regarding bone healing issues may be inadequate for the average patient because "bone healing problems sounds like, okay, well, it may take a little longer.  I don't know.  It may not heal quite as strong.  It doesn't say, wait a second.  It may not heal at all.  Everything may fall apart.  You may end up in surgery again.  That I think you need to say."  *Id.*  Thus, as explained above, the Court finds that a reasonable jury could find that Dr. Poe's pre-surgery discussion with his patient deviated from the operative standard of care and, therefore, failed adequately to warn Benally of the possibility that the surgery may fail entirely.

       h. *Dr. Poe Provided Satisfactory Post-Operative Care*

This represents the most muddled section of the dispute, in large part because Plaintiff's Argument section contains not one citation to legal authority or the record.  Consequently, the

12

Court will refer to the three specific sub-propositions set forth by the United States. However, given the scattered legal theories discussed by the parties, the Court is largely confined to rearticulating its factual findings in an effort to give the parties clarity and narrow the issues for trial.

First, the Court agrees that Dr. Poe provided adequate care during the March 30, 2009 visit. Contrary to Plaintiff's unsubstantiated contention, the record shows that Dr. Poe "examined Plaintiff and again instructed her not to put weight on her left leg," and "prescribed more pain medications and told her to take calcium and vitamins." Doc. 61 at 15. Further, Dr. Poe showed Benally x-ray images "which revealed that the pin had slipped" out of place. *Id.* Moreover, the Court notes that the alleged miscommunication between Dr. Poe and Plaintiff's physical therapist regarding weight-bearing on the repaired leg is a matter not in evidence, as Benally's deposition testimony merely establishes that she attended physical therapy sessions and engaged in some activity such as pedaling a bicycle, which is not a weight-bearing activity. *See* Doc. 67-12 at 3.

Second, the Court agrees that on August 6, 2009 Dr. Poe urged that Benally undergo a total hip replacement and that Plaintiff refused. *Id.* at 16. Further, Dr. Poe "showed Plaintiff the x-rays that indicated the pin was out of the neck of the femoral head, shortening the lower extremity" and worked to "make sure Plaintiff understood what she was saying" including by drawing "another picture of the post-surgical condition of the hip." *Id.* The Court fails to see what more Dr. Poe could have done to convince Benally that additional surgery was needed and finds risible the suggestion that Dr. Poe try "to speak with members of Ms. Benally's family to encourage her to have surgery." Doc. 67 at 20. Benally is a competent adult woman capable of making her own medical decisions; it is patently absurd and, indeed, offensive, to argue that the

13

prevailing standard of care demands that her physician seek to coerce his patient to acquiesce to unwanted treatment by enlisting the help of her family members. The Court remains uncertain as to whether the letter scheduling the follow up appointment was delayed and, if it was, to what degree such administrative errors are correctly understood as part of the standard of care.

Finally, the Court agrees with the facts that Defendant articulates in its third sub-proposition, but does not concur that they necessarily indicate that the standard of care did not require that Dr. Poe refer Benally "to another facility for a second opinion and to determine the appropriate course of treatment for her bone non-union." Doc. 61 at 17. While it is certainly true that Dr. Poe "could not force Plaintiff to agree to a hip surgery, nor could he make her agree to see another orthopedic provider" and that "Plaintiff was apparently reluctant to heed his recommendation," it does not follow that the standard of care would not require that a physician suggest an alternative healthcare provider to a reluctant patient. The Court simply has insufficient information to determine what might have been appropriate in the circumstances. Given the sprawling nature of the alleged misconduct, it is impossible for the Court to grant judgment as a matter of law on this final proposition. Instead, the Court has rearticulated the facts it found above and applied them as best it can to the sub-propositions proffered by the Defendant in the hopes of narrowing the remaining issues in this litigation.

## CONCLUSION

The disputes in this matter are far reaching and cover functionally all aspects of Dr. Poe's treatment of the Plaintiff. Given the posture of the case and the materials presented to the Court, this matter is not ripe for full summary judgment, but the Court has ruled on those individual elements amenable to partial summary judgment in order to provide clarity to the parties and focus the litigants on those issues that remain outstanding.

**IT IS THEREFORE ORDERED that** Defendants' Motion for Summary Judgment [Doc. 61] is well-taken in part and therefore will be **GRANTED IN PART** and that Defendant's Motion to Strike [Doc. 71] is well-taken and therefore will be **GRANTED.**

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE

**Roberto D. Ortega**　　　　　　　**Scott E. Borg**
Assistant U.S. Attorney　　　　　　Barber & Borg, LLC
*Attorney for the Defendant*　　　　*Attorney for the Plaintiff*